[Cite as *In re R.F.*, 2021-Ohio-4118.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| R.F., et al. | : | CASE NOS. CA2021-06-052 |
| | | CA2021-06-053 |
| | : | CA2021-06-056 |
| | : | O P I N I O N |
| | | 11/22/2021 |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 19-D000083 & 19-D000084

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Lauren L. Clouse, for appellant, L.T.

Tyron P. Borger, for appellant, B.E.

Aaron Aldridge, guardian ad litem.

**BYRNE, J.**

{¶1}     Appellants, the mother of minor children R.F. and A.E. ("Mother"), and the father of A.E. ("A.E.'s Father"), each appeal a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of R.F. and A.E. to a

children services agency.

## Background

{¶2} Warren County Children Services ("WCCS") was involved with the children in April 2018 in a case that involved substantiated abuse. The case was closed with the children placed in the custody of the maternal grandparents. Although it is unclear how, at some point, the children began living with Mother again. The agency received a referral of neglect regarding R.F. and A.E. on August 6, 2019. The referral indicated that R.F., who at the time was 11 years old, was often asking for toys, food, cigarettes, and other items on behalf of Mother. It was also reported that A.E., who at the time was four years old, was frequently running in the road, and had previously cut himself in the home on a broken window that had not been fixed. In addition, the referral indicated that there was no food in the home.

{¶3} WCCS received a second referral on August 9, 2019. At this time, it was reported that Mother's mental health began deteriorating in April, the children were reporting that they were hungry, and Mother was hospitalized at a mental health facility. At the time, Mother had visited the hospital at least 22 times between April and August 2019 for perceived problems with her throat. As explained further below, Mother's throat problems were not based in reality and were related to her mental health issues. There were also financial concerns, in addition to concerns about the condition of the home. The children were removed from the home and placed in the temporary custody of their grandparents. The children were adjudicated neglected and temporary custody with the grandparents was continued. The agency prepared a reunification plan which required Mother to engage in mental health services, complete parenting classes, and maintain stable housing and income.

{¶4}    For a period of time, Mother appeared to be making progress and to have achieved stability with her mental health.  The agency increased Mother's time with the children and in August 2020 transitioned the children back into Mother's custody with the agency retaining protective supervision.  Initially, Mother seemed to be doing well with the children in the home.  However, concerns soon arose regarding the children frequently missing school, and the home becoming dirtier with old food in the kitchen and on the floors.  The agency addressed these concerns with Mother and she appeared to listen and understand.  However, on October 2, 2020, the agency received a phone call from a school in Tennessee reporting that Mother was attempting to enroll the children in the Tennessee school.  It was discovered that Mother took the children to Tennessee for a visit and decided to stay and enroll the children in school.  The agency discovered that Mother and the children were staying with family members who were not appropriate because the family members had a history with children services that resulted in removal of their own children from the home.

{¶5}    The agency was granted emergency temporary custody and brought the children back to Ohio.  Because the maternal grandparents were no longer able to care for the children, they were placed in foster care.  Mother returned to Ohio a few days later.  The agency continued to have concerns regarding Mother's mental health. After her return from Tennessee, there was a notable increase in Mother's hospital visits and the agency continued to have concerns regarding Mother's inability to parent because of her mental health issues.  On March 4, 2021, the agency filed a motion for permanent custody of the children.

### Trial Court's Decision

{¶6}    After a hearing in which Mother and the agency caseworker testified, the

trial court granted permanent custody of the children to the agency. The trial court determined that R.F.'s father was deceased and A.E.'s Father had abandoned his child. The trial court further determined that the children had been in temporary custody of the agency for 12 months of a 22-month period and that the children could not be placed with their parent(s) within a reasonable amount of time or should not be placed with them. Finally, the trial court determined that it was in the best interest of the children to grant permanent custody to the agency. In separately filed appeals, Mother and A.E.'s Father appeal the trial court's decision.

### Permanent Custody Standard of Review

{¶7} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10.

{¶8} However, even if the juvenile court's decision is supported by sufficient evidence, "an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19. In determining whether a juvenile court's decision is against the manifest

- 4 -

weight of the evidence in a permanent custody case, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21.

**Two-Part Permanent Custody Test**

{¶9} Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21.

{¶10} Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child

cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12.

**Evidence Presented at Hearing**

{¶11}     At the permanent custody hearing, the agency presented testimony from the caseworker and called Mother as a witness as if on cross-examination. Mother also testified on her own behalf. In addition, the guardian ad litem's report, case plans, and evidence related to Mother's progress on the case plan objectives were submitted.

{¶12}     The evidence established that Mother had mental health issues, including a diagnosis of schizoaffective disorder. Early in the agency's involvement, Mother repeatedly sought health care for a perceived throat problem. In August 2019 when the dependency complaint was filed, Mother had sought medical treatment at hospitals at least 22 times since April 2019 for non-existent throat issues and had lost 40 pounds since that time because of her mental health issues. At first, Mother claimed the perceived throat problems were due to "something in her throat" but no physical or medical causes were found, despite numerous hospital visits and various testing. Later in the case, she claimed that her throat problems existed because she swallowed a small screw one of her children put in her coffee cup and she visits hospitals because she can feel the screw in her throat. At the time of the complaint, she was in the process of admission to a psychiatric hospital.

{¶13}     The agency's case plan required Mother to engage in mental health

services, complete parenting classes, maintain her source of income, and maintain the home in good condition. Mother was compliant with the case plan services and completed the parenting classes. The condition of the home was generally adequate and, although there was some concern regarding Mother falling behind on utility payments, Mother sought resources to help. She receives Social Security based on her inability to work due to her mental health diagnosis. Mother was generally compliant with the mental health requirements of her case plan. After her mental health assessment, she was required to engage in treatment at Recovery Defined where she received Risperdal shots every two weeks and engaged in therapy.

{¶14} The children were returned to Mother's care in August 2020. At that point, Mother's mental health appeared to have stabilized. Reports from Recovery Defined indicated Mother was doing well. In addition, the grandparents informed the agency that the grandmother was moving to Florida and had some unknown health issues. The grandparents believed Mother was ready to regain custody and the agency began to increase visitation, then placed the children with Mother while retaining protective supervision.

{¶15} At first, the placement back with Mother appeared to be going well, but concerns soon began to arise and Mother's mental health issues again began to impede on her ability to parent the children effectively. The caseworker noticed that the home began to become dirtier, with the floors unswept and old food lying around. The home concerns were addressed with Mother multiple times and she would clean up when directed, but she did not seem to be able to rectify the problems herself. In addition, the children's school called the agency and expressed concern regarding the children missing school frequently. Mother's therapist contacted the agency and expressed concerns with Mother's "throat

obsession." Mother again resumed her frequent hospital visits and would take the children with her to the emergency room. The children would wait with her in the hospital, sometimes for long periods of time, resulting in their missing more school.

{¶16} The guardian ad litem visited on September 30, 2020 and had concerns he expressed to the agency. The caseworker visited the next day and addressed concerns with Mother. On the following day, Mother left for Tennessee without informing the agency. Mother testified that she went to Tennessee because she needed a break and wanted new scenery. She indicated that after a day, she changed her mind and decided to enroll the children in a Tennessee school. After being notified of this by the Tennessee school, the agency was unable to make contact with Mother and called the grandparents who informed the agency that the family members the children were with in Tennessee were not appropriate for the children because the family members had a children services history resulting in the removal of their own children.

{¶17} The agency discovered that Mother missed her Risperdal shot, which is prescribed for Mother's schizoaffective disorder, during the time of the Tennessee trip. After her return from Tennessee, Mother's hospital visits increased. According to Mother, she had swallowed a small screw one of her children put in her coffee cup and she visits hospitals because she can feel the screw in her throat. Mother estimated that in the six months preceding the hearing, she had approximately 100 hospital visits and sometimes went from one hospital to another on the same day. She indicted that she has had multiple x-rays of her chest and neck, has undergone several testing procedures, including a barium swallow and an endoscopy, but doctors have not found any problems and have not located any screw.

{¶18} Although unable to obtain complete information on the number of Mother's

hospital visits, the agency was able to document approximately 40-50 hospital visits from November 2020 to February 2021. Mother had 14 emergency room visits in November 2020. In December 2020, Mother had nine hospital visits, in addition to separate six-day and 11-day psychiatric hospitalizations for suicidal thoughts. In January 2021, Mother had nine hospital visits and an additional psychiatric hospitalization and in February three visits were documented, along with yet another psychiatric hospitalization.

{¶19} Evidence was also presented that Mother hears voices – which she believes are coming from outside her house – making threats. Mother indicated she mainly hears the voices late at night and in the early morning and that when she goes to look outside no one is there. Mother stated that the voices say things about "making funeral arrangements," that they are "going to blow her brains out," and that "she's something." She also hears the voices talking about a murder. Mother indicated the voices continued for about two years and followed her when she moved. She stated she last heard the voices within the past month. At the time of the hearing Mother continued to believe that the voices were real, and denied that they were only voices in her head.

{¶20} The caseworker indicated that although Mother has been compliant with the mental health requirements in the case plan, Mother's mental health condition has not stabilized such that it would be safe to return the children to her custody. Mother indicated that although she has followed the agency's case plan requirements for her mental health, she does not agree with the diagnosis of schizoaffective disorder and that she does not believe she has any mental health issues.

{¶21} The agency caseworker indicated that after their return from Tennessee, the children were unable to be placed back with their grandparents because the couple was divorcing, and the grandmother was diagnosed with heart issues and cancer. Currently,

both children are placed in the same foster home and are doing well. Although A.E. was struggling with some behavioral issues, he was assessed for A.D.H.D., is now taking medication and is doing well. Mother has supervised visitations once a week for two hours, and the foster parents allow the children to talk to Mother on the phone every day and they monitor the calls to ensure nothing inappropriate is discussed. The foster parents would like to adopt the children and have indicated that they would continue to allow Mother to be a part of the children's lives.

{¶22} The guardian ad litem indicated that although it is clear Mother loves the children, has maintained contact with them, and has engaged in treatment for her mental health issues, Mother continues to suffer parenting problems arising from her mental health issues and there had been no significant change in the six months before the hearing. The guardian opined that although the children want to be with Mother, events have shown that she cannot provide the necessary care for them until her mental health issues subside. However, the guardian saw no indication mother will be stable and ready to parent in the near future. The guardian recommended the court grant permanent custody to the agency.

**Mother's Appeal – Best Interest Finding**

{¶23} In her appeal, Mother raises the following assignment of error:

{¶24} THE TRIAL COURT ERRED IN FINDING BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILDREN, PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶25} Mother challenges only the first part of the permanent custody test – that granting permanent custody was in the best interest of the children. When considering the best interest of a child in a permanent custody case, the juvenile court is required to

consider certain enumerated factors under R.C. 2151.414(D)(1). *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to:

> (a) [t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) [t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
> (c) [t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
> (d) [t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
> (e) [w]hether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶26} "The juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593, ¶ 24, citing *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07 thru 3-17-09, 2018-Ohio-125, ¶ 15 ("[t]o make a best interest determination, the trial court is required to consider all relevant factors listed in R.C. 2151.414[D], as well as any other relevant factors").

{¶27} In considering the children's best interests, the juvenile court found it was evident to everyone that Mother loves the children and they love her, however, Mother's mental health issues as they exist render her incapable of providing the care the children need and deserve to thrive. The court found that the children have been with the same

foster-to-adopt family since October 2, 2020 when they returned from Tennessee, and that they are bonded with the family. The court further found that the children are thriving with the foster family and the family has expressed interest in adopting the children. In considering the children's wishes, the court also relied on the recommendation of the guardian ad litem who recommended granting permanent custody.

{¶28}   The court further determined that the children have been in and out of agency custody and various placements. The court acknowledged the need for a legally secure and stable environment which cannot be achieved without a grant of permanent custody. As mentioned, the juvenile court found that Mother is incapable of caring for the children due to her mental health issues. The court further determined that although Mother made substantial progress on her case plan objectives, the evidence showed the need for removal of the children. Mother's mental health difficulties have been detrimental to the children's wellbeing and have not been sufficiently resolved.

{¶29}   The court also found that the children cannot be placed with either parent, and that the children are in need of a legally secure placement that cannot be achieved without a grant of permanent custody to the agency. The court determined that although Mother loves the children, her mental health issues render her unable and incapable of caring for them. R.K.'s father is deceased and A.E.'s Father has not been involved in the child's life during the case. A.E.'s Father made one phone call to the agency during the case, indicating that one of his older daughters was interested in obtaining custody of A.E., but when the agency called, the daughter informed them she was not interested in custody and had informed her father she would help if he received custody of the child. The maternal grandparents are no longer a placement option. Placement with another maternal relative was explored but determined not to be a viable option when the relative acted

inappropriately with one of the children.

{¶30} The court found that although Mother made progress on completing her case plan, she has failed to remedy the concerns that led to the children's removal. The court determined that Mother has not demonstrated that she is able to provide the proper care and attention the children need because her mental disorders prevent her from doing so.

{¶31} After carefully reviewing the record in this case and the statutory best interest factors, we find that the juvenile court did not err in determining that it was in the children's best interest to grant permanent custody to the agency. We agree with the juvenile court's conclusion that Mother loves her children, and the children may want to be with Mother, but Mother's mental health condition prevents her from caring for them on a regular basis. Prior to the start of this case, Mother was unable to care for the children and they were placed with their grandparents. After agency removal and mental health treatment, Mother appeared to be stabilized and the children were returned to her care with protective supervision by the agency. Mother's mental health deteriorated and after the Tennessee trip and Mother's attempt to enroll the children in a Tennessee school on a whim, the children were again removed from Mother's custody. Because the grandparents were no longer able to care for them, the children were placed in foster care.

{¶32} After returning from Tennessee, Mother's mental health continued to deteriorate as evidenced by her frequent hospital visits and numerous psychiatric hospitalizations. Although, as she argues on appeal, Mother loves the children, is compliant with treatment, and has followed the case plan, Mother refuses to accept that she has mental health problems or that these problems impede her ability to parent the children. "[T]he case plan is simply a means to a goal, but not the goal itself." *In re A.R.*, 12th Dist.

Butler No. CA2015-08-143, 2016-Ohio-4919 at ¶ 18. Instead, "the key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. The concerns that were present at the start of this case were still concerns at the permanent custody hearing, as evidenced by Mother's frequent psychiatric hospitalizations.

{¶33} Mother continues to believe that the "screw" came to be in her throat because one of her children placed the screw in her drink and she swallowed it. The fact that Mother's narrative about the how the (nonexistent) screw came to be in her throat involves one of her children, and more specifically that she blames the child for the situation, is concerning. This shows that there is no line separating her children from the beliefs created by Mother's mental health issues – beliefs that not only cause her to engage in frequent unnecessary emergency room visits which included the children and psychiatric hospitalizations, but also involves voices talking to her about murder and suicide. This raises real concerns about the children's care and, when coupled with Mother's denial that she suffers from mental health issues, Mother's difficulties properly caring for the safety of the family home, and her frequently causing the children to miss school, underscores the juvenile court's determination that the children's need of a legally secure placement cannot be achieved without a grant of permanent custody to the agency. The children are thriving under their foster family's care and they are bonded to their foster parents.

{¶34} In conclusion, we find no error in the trial court's determination that it is in the best interest of the children to grant permanent custody to the agency. This is a sad case. As previously mentioned, the record demonstrates that Mother loves her children. But Mother's mental health has deteriorated to the point where she is unable to properly

parent her children, and it is in the children's best interest to be placed in the permanent custody of the agency.

{¶35} As a reminder, Mother has only challenged the juvenile court's best interests findings. Mother does not challenge the juvenile court's findings with respect to the second step of the two-part permanent custody test, see R.C. 2151.414(B)(1)(a) to (e), namely that the children have been in the custody of the agency for at least 12 months of a consecutive 22-month period. We therefore need not review the trial court's findings under the second step of the permanent custody test, and we affirm the trial court's judgment with respect to Mother.

**A.E.'s Father's Appeal**

{¶36} Counsel for A.E.'s Father has filed a brief with this court pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967), which: (1) indicates that a careful review of the record from the proceedings below fails to disclose any errors by the trial court prejudicial to the rights of A.E.'s Father upon which an assignment of error may be predicated; (2) lists one potential error "that might arguably support the appeal," *Anders* at 744; (3) requests that this court review the record independently to determine whether the proceedings are free from prejudicial error and without infringement of A.E.'s Father's constitutional rights; (4) requests permission to withdraw as counsel for A.E.'s Father on the basis that the appeal is wholly frivolous; and (5) certifies that a copy of both the brief and motion to withdraw have been served upon A.E.'s Father .

{¶37} Having allowed A.E.'s Father sufficient time to respond, and no response having been received, we have accordingly examined the record and find no error prejudicial to his rights in the proceedings in the trial court. Therefore, the motion of counsel for A.E.'s Father requesting to withdraw as counsel is granted, and A.E.'s father's appeal is

- 15 -

hereby dismissed for the reason that it is wholly frivolous.

## Conclusion

{¶38} Mother's assignment of error is overruled and the juvenile court's decision granting permanent custody to WCCS is affirmed. A.E.'s Father's appeal is dismissed and his counsel's request to withdraw is granted.

Judgment affirmed in Case Nos. CA2021-06-052 and CA2021-06-053, and appeal dismissed in Case No. CA2021-06-056.


PIPER, P.J., and HENDRICKSON, J., concur.