[Cite as *In re C.P.*, 2022-Ohio-3320.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| C.P. | : | CASE NO. CA2022-05-004 |
| | : | O P I N I O N<br>9/21/2022 |
| | : | |

APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2019-3097

Bruce S. Wallace, for appellant.

Zac Corbin, Brown County Prosecuting Attorney, and Courtney A. Worley, Assistant Prosecuting Attorney, for appellee.

**BYRNE, J.**

{¶1} Appellant ("Father"), the biological father of C.P. ("Child"), appeals the decision of the Brown County Court of Common Pleas, Juvenile Division, granting permanent custody of Child to the Brown County Department of Job and Family Services ("BCDJFS" or "the agency"). For the reasons outlined below, we affirm the juvenile court's decision.

**I. Factual and Procedural Background**

{¶2} Child was born in November 2015. Child's biological mother ("Mother") was in a relationship with Father at the time and the two lived together in Michigan. Father

supported Child financially. In 2016, when Child was eight months old, Mother and Father ended their relationship, and Mother and Child moved to Ohio, while Father remained in Michigan. Father did not provide financial or other support to Child after that.

{¶3} In March 2018, BCDJFS received a report that Child was hanging out of the open window of Mother's apartment. On investigating, BCDJFS workers found Mother asleep and observed deplorable living conditions in the apartment. Child was temporarily removed and placed in a foster home. Mother was given and completed a case plan. Child was then reunified with Mother. Father was present for one of four hearings held on this matter. This was the first time Father had any contact with Mother since Mother and Child moved to Ohio in 2016.

{¶4} On April 23, 2019, BCDJFS received a report that Child was unsupervised outside his apartment building for about 45 minutes. BCDJFS investigated the home and again found deplorable living conditions. The agency instituted a safety plan the same day and Child was removed to his maternal aunt's home. Mother was charged with felony child endangerment. On May 6, 2019, Child appeared, unaccompanied, at the BCDJFS office and a caseworker happened to identify him. In both instances, Mother was later found sleeping in her apartment and was unaware Child had left; in the latter instance, Child's maternal aunt was also found sleeping at Mother's apartment. On May 7, the juvenile court granted BCDJFS temporary custody of Child. Child was placed in the same foster home where he was previously placed.

{¶5} Father was notified of the proceedings, and he appeared at a hearing held on June 25, 2019. Father requested counsel be assigned to him, but his request was denied because Father was found financially ineligible for the services of the public defender's office. A case plan was implemented, and on March 2, 2020, following successful completion of the plan, Mother was reunited with Child. Despite having notice, Father did

not appear at any of the hearings after the June 25, 2019 hearing. Father was offered services and visitation by the caseworker at that time, but he declined due to transportation difficulties.

{¶6} On October 28, 2020, BCDJFS received a report of a domestic disturbance at Mother's home. Upon arrival, BCDJFS workers again observed deplorable living conditions. They again instituted a safety plan the same day. Mother was charged with another count of felony child endangerment and arrested for violating probation on her previous child endangerment conviction.

{¶7} On November 19, 2020, BCDJFS filed another motion for temporary custody. The juvenile court granted the motion on November 23, 2020 following a shelter care hearing. Despite receiving notice, Father did not attend the hearing. The juvenile court again placed Child with the same foster family. Another case plan was put in place for Mother.

{¶8} An adjudicatory hearing was held on December 28, 2020. Father was again absent, despite receiving notice. On February 23, 2021, a dispositional hearing was held. Father was present, and requested, and was granted a public defender. The hearing was continued to April 19, 2021. On April 16, 2021, BCDJFS filed its first motion for permanent custody, which was later withdrawn for procedural reasons.

{¶9} On April 19, 2021, Mother signed a permanent surrender of her parental rights. Child remained in the temporary custody of BCDJFS. On April 28, 2021, Father filed a motion requesting visitation with Child. On June 15, 2021, a case plan for Father was filed with the juvenile court. Father was ordered to complete parenting education, mental health treatment, a psychological evaluation, and a drug and alcohol assessment, and ordered to complete a home study pursuant to the Interstate Compact on the Placement of Children ("ICPC").

{¶10} BCDJFS implemented the ICPC through the state of Michigan. While the Michigan ICPC process ended with the recommendation that Child be placed with Father, BCDJFS declined to accept the recommendation. Child's BCDJFS caseworker testified that while ICPC reports are ordinarily between 20 and 30 pages, this one was a mere one page. While ICPC reports ordinarily have criminal history attached, this one did not, and the criminal history was only provided after the caseworker made repeated phone calls to the Michigan agency to request it. The lack of information in the report led BCDJFS to conclude that there was not enough information to support Child's placement with Father or to establish that Father had a history of stability and sobriety. In addition to its initial failure to include Father's criminal history, the ICPC report failed to include the criminal history and children services history of any individuals residing in Father's home. BCDJFS was also concerned that the Michigan agency recommended placement even knowing that Father had an active warrant.

{¶11} BCDJFS coordinated visitation between Father and Child beginning in July 2021. The first of these visits was the first time that Father had seen Child since Mother and Child moved out in 2016—that is, the first time Father had seen Child in five years. Father had four visits with Child, three in person, and one via Zoom when he was in inpatient treatment. But while Father completed a psychological evaluation, he failed to maintain regular contact with BCDJFS, failed to provide verification he had attended parenting classes, and failed to complete mental health treatment. On September 2, 2021, BCDJFS filed for permanent custody of Child.

{¶12} A hearing was held on December 13, 2021. The juvenile court heard testimony from Father, Father's father and stepmother, a BCDJFS caseworker, and Child's guardian ad litem ("GAL"). Uncontested testimony established that Father had no bond with Child, but Father testified that he could offer Child stability. Father testified that he

works for his father, and lives with his girlfriend of one year at a house owned by the girlfriend's mother. He stated that his girlfriend, his father, his stepmother, and his sister could watch Child while Father worked. But Father admitted that his girlfriend had never met Child, and his other family members had last seen Child when he was eight months old, in 2016.

{¶13} Father admitted that he had two OVI convictions, the most recent of which occurred on December 29, 2020. While he told the psychological evaluator that he had been sober since that time, when pressed at trial, he at first stated that he had a "relapse" in June 2021. He then said that December 29, 2020 was his alcohol sobriety date, while June 1, 2021 was his "complete sobriety date" for "everything." In context, it appears Father was stating that before or on June 1, 2021, he used substances other than alcohol—perhaps the marijuana or "harder substances" he had referred to just before this exchange, though Father did not clarify. Father also admitted that he failed to inform the ICPC evaluators of his most recent OVI. Father was still on probation at the time of trial.

{¶14} Father also admitted that he was over $5,000 in arrears in child support for another child, his daughter.[1] Father was uncertain of his monthly child support obligation to his daughter. He explained that he was in arrears because he could not afford to pay for his home, food, and his daughter's child support.

{¶15} The magistrate awarded permanent custody of Child to the agency. Father filed objections to the magistrate's decision. The juvenile court overruled those objections and affirmed the magistrate's decision to award permanent custody to the agency.

## II. Legal Analysis

{¶16} Father timely appealed, raising one assignment of error:

---

1. Father's daughter has a different mother than Child's mother.

{¶17} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN FINDING THAT PERMANENT CUSTODY OF [CHILD] SHOULD BE GRANTED TO BROWN COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES.

{¶18} Father's brief references several arguments purportedly supporting his sole assignment of error, but those arguments are sparse. We will analyze those arguments—or assertions—below after summarizing the applicable legal standard and the portions of the magistrate's and juvenile court's decisions relevant to Father's appeal.

**A. Applicable Law**

{¶19} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.P.*, 12th Dist. Preble No. CA2021-11-017, 2022-Ohio-1155, ¶ 11. Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, using, in part, the factors of R.C. 2151.414(D). *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047, CA2021-08-048, and CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must then find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period; and (4) when the previous circumstances do not apply, the child cannot be placed with either of the child's parents within a reasonable time or

- 6 -

should not be placed with the parents. R.C. 2151.414(B)(1)(a), (b), (c), and (d). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶20} An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re R.F.*, 12th Dist. Warren Nos. CA2021-06-052, CA2021-06-053, and CA2021-06-056, 2021-Ohio-4118, ¶ 7. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re M.N.*, 12th Dist. Fayette No. CA2021-07-015, 2021-Ohio-4042, ¶ 19.

{¶21} Even if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence. *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. To determine whether the judgment was against the manifest weight of the evidence, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re K.M.*, 12th Dist. Butler No. CA2020-03-031, CA2020-03-032, and CA2020-03-033, 2020-Ohio-3602, ¶ 25. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren No. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is most favorable and consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton No. CA2021-10-030 and CA2021-10-031, 2022-

Ohio-998, ¶ 63.

**B. Magistrate's Decision, Father's Objections, and Juvenile Court's Decision**

{¶22} As for the first part of the two-part test described above, the magistrate in this case found that a grant of permanent custody to BCDJFS was in Child's best interests. As for the second part of the two-part test, the magistrate found that (1) Child had been in the temporary custody of BCDJFS for at least 12 months of a consecutive 22-month period, (2) Child had been abandoned by Father, and (3) Child could not and should not be placed with Father in a reasonable time. Having found that both parts of the two-part test were satisfied, the magistrate granted BCDJFS's motion for permanent custody.

{¶23} Father objected to the magistrate's decision on multiple grounds. As relevant here, Father objected to the magistrate's finding that permanent custody was in Child's best interests, that Father abandoned Child, and that Child could not and should not be placed with Father within a reasonable time. That said, Father admitted that Child had been in the custody of the agency for 12 or more months of a consecutive 22-month period.

{¶24} In its opinion overruling Father's objections to the magistrate's decision, the juvenile court noted the undisputed fact that Child had been in the temporary custody of BCDJFS for "much more" than 12 months of a consecutive 22-month period and found that the magistrate was correct in reaching this conclusion. The juvenile court also found that the evidence showed that Father had abandoned Child. The juvenile court did not mention the magistrate's finding that Child could not and should not be placed with Father within a reasonable time.

{¶25} The juvenile court also addressed Child's best interests, described Child's need for permanency, noted that "there was testimony from [BCDJFS] that [Child] is bonded to his foster home," and that this "appears to be the only real home [Child] has known." The juvenile court also determined based on Child's history of removals from Mother's home

and Father's history of "making excuses about his dismal failure to be in contact with [Child] since [Child] was 8 months of age," that legally secure permanent placement for Child could not be achieved without a grant of permanent custody to BCDJFS. The juvenile court noted the lack of a bond between Father and Father's extended family network and Child, concluding that testimony established that Father is "a stranger" to Child and that Father's girlfriend had "never met" Child and the other would-be caregivers had "not seen [Child] since he was an infant." Finally, in making its best interest determination, the juvenile court addressed Father's failure to take responsibility for his actions, including his history of repeated OVI convictions and failure to pay child support for his other child.

## C. Abandonment and "12 of 22" Analysis

{¶26} In support of his assignment of error, Father states that the sole issue presented for review is whether the juvenile court erred in finding under R.C. 2151.414 that Father "had abandoned the minor child" and in finding "that the minor child should not be placed with [Father] within a reasonable period of time." These are two of the multiple options for the second part of the permanent custody test described above. R.C. 2151.414(B)(1)(a) and (b). Father offered no further argument in support of this issue presented for review.

{¶27} Father's assertion fails. As stated above, in addition to finding that Father abandoned Child and that Child could not be placed with Father within a reasonable period of time, the magistrate found that Child had been in the temporary custody of BCDJFS for at least 12 months of a consecutive 22-month period, a circumstance we have called the "12 of 22" provision. *See In re A.D.*, 12th Dist. Clermont No. CA2021-11-060, 2022-Ohio-736, ¶ 20; R.C. 2151.414(B)(1)(d). Father did not object to the magistrate's "12 of 22" finding when this matter was before the trial court, and he does not argue now that the juvenile court erred with respect to the "12 of 22" finding. As noted above, only one of the

R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, at ¶ 16. Because the juvenile court found by clear and convincing evidence that the "12 of 22" provision had been satisfied under R.C. 2151.414(B)(1)(d), its abandonment and "reasonable period of time" findings under R.C. 2151.414(B)(1)(a) and (b) were unnecessary to grant permanent custody. *Id.* Therefore, even if Father had articulated an argument about why the juvenile court's abandonment and "reasonable period of time" findings were in error—which he did not—that argument would be futile. Father's assertion that the juvenile court erred with respect to its abandonment and "reasonable period of time" findings is therefore moot, and we need not consider that argument further. *In re D.S.*, 2022-Ohio-998, at ¶ 66 (holding that because "12-of-22" finding was not challenged on appeal, "we may affirm the trial court's decision without the need to conduct any further analysis"); *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 24 (when mother failed to dispute "12 of 22" finding, "[t]he only issue" remaining was whether permanent custody was in children's best interest). Father has shown no error related to the second part of the permanent custody test, so we next turn to the first part of that test, concerning the Child's best interest.[2]

### D. Best Interest Analysis

**{¶28}** In the final lines of Father's appellate brief, after addressing issues other than best interests, Father states that "further * * * it is clear that a review of the facts and the relevant law make it clear that granting of permanent custody and terminating a legal

---

2. Father argues that BCDJFS did not fulfill a statutory duty under R.C. 2151.414(E)(1) to seek reunification between him and Child. But that provision only relates to a juvenile court's analysis of whether a child could be placed with either parent within a reasonable time or should not be placed with the parents, and, as we have already explained above, we need not consider that issue because Father does not challenge the juvenile court's "12 of 22" finding. We therefore need not consider Father's R.C. 2151.414(E)(1) finding further. Even if we did, we would find no merit to Father's argument because the record establishes that BCDFJS made diligent efforts to reunify Child with Father before the permanent custody finding.

relationship of the child with his Father is not in the best interest of the child in any way." Father offers no case law, statutes, or arguments to support this assertion. We have long recognized that "[t]he burden of affirmatively demonstrating error on appeal and substantiating one's arguments in support thereof falls upon the appellant." *Rathert v. Kempker*, 12th Dist. Clermont No. CA2010-06-043, 2011-Ohio-1873, ¶ 12. "It is not this court's duty to 'root out' or develop an argument that can support an assigned error." *Warman v. Warman*, 12th Dist. Butler No. CA2016-08-170, 2017-Ohio-7462, ¶ 19. That said, recognizing that "permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case," we will briefly address the best interest factors weighed by the juvenile court. *In re S.F.T.*, 12th Dist. Butler Nos. CA2010-02-043 thru CA2010-02-046, 2010-Ohio-3706, ¶ 10.

{¶29} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, the court must consider all relevant factors, including, but not limited to the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

*In re: B.L.*, 12th Dist. Butler No. CA2017-09-147 and CA2017-09-148, 2018-Ohio-547, ¶ 37. The juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593.

{¶30} We first consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). To be clear, we are not analyzing whether Child should have remained with Mother nor examining Mother's failings; Mother forfeited her parental rights and is no longer a party. Rather, in analyzing this factor, we consider Child's interaction and interrelationship with Father and others. Testimony made clear that there was no bond at all between Father and Child, because of Father's not having seen Child at all between 2016 and 2021, a five-year period. Father's girlfriend, whom he stated would be Child's primary caregiver while he worked during the day, had never met Child. Father's father, stepmother, and sister, whom Father noted would be alternative caregivers, had not seen Child since he was an infant. The reports and testimony of Child's GAL, who had served in that capacity since BCDJFS first entered Child's life, indicate that while "[t]here are no concerns during" Father's visits with Child, Child "has bad behaviors after visits." On the other hand, the GAL stated that Child "is bonded with his [foster] placement and placement children and is doing well." The GAL stated that placing Child in Father's home "would be basically like taking a child and placing [him] in a stranger's or an acquaintance's home," which would be "deeply concerning based on the fact that he's already developing or having a hard time connecting and attaching to the stable people in his life."

{¶31} The second best interest factor is the wishes of the child as expressed by the child or the child's GAL. R.C. 2151.414(D)(1)(b). Child was too young to express his

wishes, but, as stated above, the GAL opined that permanent custody should be awarded to the agency and that Child should not be placed with Father.

{¶32} The next best interest factor is "[t]he custodial history of the child." R.C. 2151.414(D)(1)(c). As the juvenile court pointed out, Child "has had a long and very sad history of repeated removals from his Mother." This includes Child spending more than 12 of the last 22 months before the permanent custody hearing in the temporary custody of BCDJFS. Despite having notice of Child's repeated removals, Father only appeared in court on two instances in previous removals until appearing more consistently after Child's most recent removal. Father tries to justify this by citing transportation difficulties, which the juvenile court properly noted were "entirely due to his own activity" of repeated OVI offenses. Meanwhile, Child has been placed with the same foster family for much of his life.

{¶33} The next best interest factor is the child's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). Testimony established that at the time of the trial on December 13, 2021, Child had been in the temporary custody of BCDJFS for 36 percent of his life, or 803 days in total, including 411 continuous days. By contrast, factoring the eight months of cohabitation at the beginning of Child's life, Father only lived with Child for, generously, about 11 percent of Child's life. Fortunately, each time Child was removed from Mother's custody, Child was placed with the same foster family. The record even reflects that Child refers to Mother by her given name and to his foster mother as "mom." As the juvenile court pointed out, his foster home "appears to be the only real home [Child] has known." While Father complains that there was no testimony about whether Child's foster family would adopt him, thus providing him with permanency, we note that the family is repeatedly referred to in the record as a "foster-to-adopt" family,

and the value of the long-term stability it has thus far provided to Child is immeasurable in his tragically turbulent young life.

{¶34} It is also questionable whether Father could provide permanency or security for Child. Father is more than $5,000 in arrears in child support for his other child and testified to his financial difficulties. Father has shown he is unable or unwilling to provide for the other child he has a legal responsibility to provide for, even when he has not provided any financial support to Child since his infancy.

{¶35} Based on our review of the testimony at trial, we find that the juvenile court did not err in finding that permanent custody to BCDJFS was in Child's best interest.

{¶36} Even if Father's argument that the juvenile court erred in finding that he abandoned Child may be read as applying to the best interest part of the permanent custody test—rather than as applying to the abandonment factor under the second part of the test—Father's argument fails. Father makes no arguments in his brief and cites no case law to explain why the juvenile court's abandonment determination was erroneous. As we have noted, "R.C. 2151.011(C) plainly states that '[f]or purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, *regardless of whether the parents resume contact with the child after that period of ninety days*.'" (Emphasis sic.) *In re D.C.*, 12th Dist. Fayette No. CA2015-03-006, 2015-Ohio-3178, ¶ 38, quoting R.C. 2151.011(C). The juvenile court was presented with clear and convincing evidence in the form of testimony from the BCDJFS caseworker, the GAL, and the admissions of Father himself that he had not visited or maintained contact with Child between when Child was eight months old and 2021—a period of around five years—nor did he try to make contact with Child until 2021. That he attempted to reinitiate contact after that time is irrelevant for a finding of statutory abandonment.

{¶37} While Father claims he did not know where Mother and Child resided after he and Mother ended their relationship, this does not explain why he did not attempt to see Child after being notified via summons in both 2019 and 2020 that Child had been temporarily removed from Mother's custody. Father's testimony that he was unable to see Child after learning of Child's whereabouts due to transportation issues stemming from his OVI convictions is similarly unpersuasive. So too is his contention in his objections to the Magistrate's decision that "until he had an attorney, he did not know how to obtain visitation," particularly given his purported efforts to retain an attorney, which consisted of applying for a public defender, inquiring with two different private attorneys, and then abandoning his search. It is clear from the facts that the juvenile court did not err in finding that Child was abandoned by Father, and to the extent that Father attempts to argue that permanent custody was not in Child's best interest because Father did not abandon Child, Father's argument is meritless.

{¶38} The juvenile court did not err in determining that an award of permanent custody to BCDJFS was in Child's best interest. There is more than sufficient credible evidence to support the juvenile court's determination that the statutory standards for permanent custody have been met. *See In re A.S.*, 12th Dist. Butler Nos. CA2019-05-071, CA2019-05-072, and CA2019-05-073, 2019-Ohio-4127, ¶ 19.

### III. Conclusion

{¶39} We have carefully reviewed the evidence in this case. We find that the juvenile court's determinations that Father abandoned Child, that Child was in the temporary custody of BCDJFS for the requisite period under R.C. 2151.414(B)(1)—12 months of a 22-month period—and that an award of permanent custody to BCDJFS is in the best interests of Child are supported by clear and convincing evidence and are not against the manifest weight of the evidence.

{**¶40**} Having found no merit to Father's arguments, we overrule Father's sole assignment of error.

{**¶41**} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.