**[Cite as *In re D.P.*, 2022-Ohio-4553.]**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

IN RE: :

    D.P., et al. : CASE NOS. CA2022-08-043
CA2022-08-044

:

: O P I N I O N
12/19/2022

:

:

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2019JC05172

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

The Law Office of Wendy R. Calaway, Co., L.P.A., and Wendy R. Calaway, for appellant.

**BYRNE, J.**

{¶1} Appellant ("Father"), the biological father of "Dominic" and "Christopher" (collectively "the twins"), appeals the decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of the twins to the Clermont County Department of Job and Family Services ("CCDJFS" or "the agency").[1] For the reasons

---

1. "Dominic" and "Christopher" are pseudonyms, adopted in this opinion for purposes of privacy and readability. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1.

outlined below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶2} Dominic and Christopher are biological twins who were born eleven weeks prematurely, in June 2018. Both required extended hospital stays following birth. While Christopher has no present medical concerns, Dominic has a number of congenital health issues, including short bowel syndrome and clubbed feet. As a result, he requires highly specialized care.

{¶3} Dominic has had several surgeries to remove portions of his intestines. He requires the daily use of a gastrostomy tube ("G-tube"), which is connected to his stomach through an incision in his abdomen, and through which he receives nutrition and hydration. The G-tube remains in place for 22 hours every day and requires changing every four hours. The G-tube may not get wet, so it must be removed and the opening specially patched and sealed for his baths. Dominic's caregivers have to mix medicine for delivery through the G-tube every morning and every evening. Dominic also requires new nutritional formula every 24 hours. Because of his short bowel syndrome, Dominic has frequent diarrhea and requires regular diaper changes, including four or five changes every night. Dominic typically cries when he has a bowel movement, as the stool is acidic (as a result of his short bowel syndrome) and burns and may break down his skin unless his diaper is immediately changed.

{¶4} Dominic also has a central line in his chest, which delivers intravenous fluids into his heart overnight. A nurse comes twice a week to change and care for the line.

{¶5} Dominic has had several surgeries for his clubbed feet. He cannot walk despite being three years old, and he must wear leg braces overnight. The braces need to be placed and removed by his caregivers.

{¶6}   Dominic requires frequent visits to medical providers, including monthly gastrointestinal appointments, orthopedic appointments, and frequent trips to the emergency room.  If his G-tube or his central line becomes unattached or breaks, he requires an immediate trip to the emergency room.  He must also immediately go to the emergency room if he has a fever, because a fever could indicate bacteria in his central line, which is a life-threatening condition.  In all, Dominic visits the hospital between four and five times per month.

{¶7}   Father and the twins' biological mother ("Mother") lived together and raised the twins together from their birth in June 2018 until May 2019.  During those 11 months both parents received training from medical personnel with respect to Dominic's medical care needs.  Father testified that during that 11-month period he provided "65 to 70 percent" of Dominic's care.  He was "self-employed" as a handyman and "only worked a couple days a week."  The family relied principally on Mother's income from her part-time cleaning business.  In May 2019, Father was arrested and went on to serve a prison term for driving under suspension and felony non-support for two of his other biological children.  As of September 2020, he owed $76,000.00 total in child support to his other children.[2]

{¶8}   On August 10, 2019, Mother died of a drug overdose.  Police officers found Dominic and Christopher in her home.  They appeared blue and were cold to the touch. The twins were removed and placed with a foster family the same day.  Shortly thereafter, the twins were adjudicated dependent and CCDJFS was granted temporary custody. Father remained in prison at the time.  The twins remained with the same foster family, and temporary custody was extended on July 9, 2020. The same day, the agency filed a motion for permanent custody.  Father objected to the motion and filed a motion for continuance

---

2. Father's other children are not at issue in this appeal.

pending his anticipated release from prison in February 2021, though he did not specify the length of the requested continuance. Father also sought leave to complete a case plan so that he could regain custody of the twins.

{¶9} A trial was held before a magistrate on September 4, 2020. Father testified via Zoom from prison. On December 21, 2020, the magistrate issued a decision denying Father's request for a continuance and granting permanent custody to CCDJFS. On December 25, 2020, Father was granted an unexpected early release from prison. Shortly thereafter, he timely objected to the magistrate's decision. The juvenile court sustained Father's objections to the magistrate's decision, noting that "a continuance is warranted and imperative to secure fair treatment for the father." The matter was then remanded, and Father was ordered to complete a case plan "to ensure that he is capable of providing a secure, stable residence, income and appropriate care for his child[ren]."

{¶10} On March 25, 2021, temporary custody to the agency was extended and a case plan was filed with the juvenile court. As part of the plan, Father was required to obtain "safe, stable, independent housing" and to obtain and maintain employment. Additionally, Father was required to complete a drug assessment and follow recommendations, complete a mental health assessment and follow recommendations, complete training for Dominic's care, complete parenting education, and acquire access to transportation. Father's case plan also included visitation with the twins.

{¶11} Father had a drug assessment and was not recommended for services. He reported having a mental health assessment, but caseworkers were unable to confirm this was completed. Father completed all aspects of the required medical training except the home supervision portion, when medical workers would have observed Father performing the relevant procedures in his home. This portion of the training required Father to first

have appropriate housing, which the agency deemed that he lacked.

{¶12} On July 13, 2021, the agency once more filed a motion for permanent custody. Father filed a competing motion for custody. In September 2021, when the twins were three years old, a second trial was held before a magistrate. We have already summarized testimony regarding the twins' custodial history and Dominic's medical needs above. We will summarize additional trial testimony below in the analysis section of our opinion.

{¶13} In her decision, the magistrate summarized the trial testimony and applied the R.C. 2151.414(B)(1) two-part permanent custody test. As for the first part of the two-part test, the magistrate found that a grant of permanent custody to CCDJFS was in the twins' best interests. As for the second part of the two-part test, the magistrate found that (1) the twins had been in the temporary custody of CCDJFS for at least 12 months of a consecutive 22-month period (the "12 of 22" finding), (2) the twins had been abandoned by Father, and (3) the twins could not and should not be placed with Father in a reasonable time. Having found that both parts of the two-part test were satisfied, the magistrate granted CCDJFS's motions for permanent custody and denied Father's motion for custody.

{¶14} Father objected to the magistrate's finding that permanent custody was in the twins' best interests, arguing that the magistrate's decision to grant custody to the agency was against the manifest weight of the evidence. However, Father did not dispute the magistrate's "12 of 22" finding or its findings that the twins had been abandoned and that the twins could not and should not be placed with Father in a reasonable time.

{¶15} In response to Father's objections, the juvenile court conducted an independent analysis. With regard to the first part of the R.C. 2151.414(B)(1) permanent custody test and Father's objections, the juvenile court addressed each of the statutory best interest factors and concluded that "there is substantial credible evidence that is both clear

- 5 -

and convincing that it is in the best interest of [the twins] to permanently terminate parental rights and grant permanent custody to [CCDJFS]." Though Father did not object to the magistrate's findings with respect to the second part of the permanent custody test under R.C. 2151.414(B)(1), the juvenile court found that the record supported the magistrate's "12 of 22" finding. The juvenile court therefore overruled Father's objections and affirmed the magistrate's decision.[3]

{¶16} Father timely appealed.

## II. Legal Analysis

{¶17} On appeal, Father raises only one assignment of error:

{¶18} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN ADOPTING THE MAGISTRATE'S DECISION PERMANENTLY TERMINATING APPELLANT'S PARENTAL RIGHTS.

{¶19} In his brief, Father explains the law applicable to permanent custody decisions and then argues—in a scant three paragraphs without citation to any legal authority or the record—that the trial court "lost its way" in awarding permanent custody of Dominic and Christopher to CCDJFS. We construe Father's assertion that the trial court "lost its way" as an argument that the juvenile court's decision was not proven by clear and convincing evidence and was against the manifest weight of the evidence. We will address that argument below after summarizing the applicable legal standard.

## A. Applicable Law

{¶20} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and

---

3. The juvenile court did not overrule Father's objections in one respect: it found that a single sentence in the magistrate's decision was not supported by the record. That sentence is not at issue in this appeal.

convincing evidence that the statutory standards for permanent custody have been met. *In re K.P.,* 12th Dist. Preble No. CA2021-11-017, 2022-Ohio-1155, ¶ 11. Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.,* 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, using, in part, the factors of R.C. 2151.414(D). *In re M.H.,* 12th Dist. Clermont Nos. CA2021-08-047, CA2021-08-048, and CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.,* 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period; and (4) when the previous circumstances do not apply, the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents. R.C. 2151.414(B)(1)(a), (b), (c), and (d). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re C.S.,* 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶21} An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re R.F.,* 12th Dist. Warren Nos. CA2021-06-052, CA2021-06-053, and CA2021-06-056, 2021-Ohio-4118, ¶ 7. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re M.N.,* 12th Dist. Fayette No. CA2021-07-015, 2021-

Ohio-4042, ¶ 19.

**{¶22}** Even if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence. *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. To determine whether the judgment was against the manifest weight of the evidence, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re K.M.*, 12th Dist. Butler Nos. CA2020-03-031, CA2020-03-032, and CA2020-03-033, 2020-Ohio-3602, ¶ 25. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is most favorable and consistent with the verdict and judgment. *In re D.S.*, 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

## B. First Prong of the Permanent Custody Test: Best Interest Analysis

**{¶23}** R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the

maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

*In re: B.L.,* 12th Dist. Butler Nos. CA2017-09-147 and CA2017-09-148, 2018-Ohio-547, ¶ 37. A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.,* 12th Dist. Clermont No. CA2018-08-063, 2019-Ohio-593.

**{¶24}** As stated above, the first best interest factor is "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). The juvenile court considered the twins' relationships with Father, with each other, and with the foster parents who cared for them at the time of the second trial. We do the same.[4]

**{¶25}** Father testified that he provided most of the twins' care during the first 11 months of their lives and that he was trained on how to meet Dominic's unique medical needs. While this is commendable, we can safely assume that the twins have no memories of Father from the first 11 months of their lives. From the time Father was incarcerated to the time of the juvenile court's decision Father only saw the twins during brief, scheduled visitations. The court-appointed guardian ad litem ("GAL") observed some of those

---

4. We need not consider the twins' relationship with Mother because she is deceased. Likewise, we need not consider the twins' relationship with their first foster family because the twins were removed from that family's care after the foster mother gave birth to her own set of twins and the family was no longer able to provide Dominic and Christopher the care they needed.

visitations. The GAL declined to comment on whether the twins appeared bonded with Father. However, she noted that Father interacted "fine" with the twins, that the twins "were totally comfortable" in the visitation environment, and that she did not "see any issues there." However, as the magistrate noted, "over the last two years, Father will have spent only about 30 hours with the [twins]." Father's relationship with the twins at the time of the second trial was thus minimal, at best. This was the case even after the trial court reversed the magistrate's decision after the first trial and gave Father a significant amount of additional time to complete his case plan and have visitation with the twins.

{¶26} On the other hand, Dominic and Christopher have been the only consistent presence in each other's lives since their birth. Despite the disruption caused by Father's incarceration, Mother's death, and the twins' transfer between foster homes, they have remained as close as can be expected for young children. The twins' second foster mother testified that "they love each other," and "they interact and play a lot." She noted that Christopher "encourages" Dominic "to move more, to run and to jump." A Clermont County Children Services caseworker testified that Dominic and Christopher "almost seem to have their own language." When Dominic returned from an extended hospital stay at one point, Christopher was "super excited to see him." The caseworker testified that "they're affectionate with each other when they're not hitting each other"—a characterization that, for three-year-old children, suggests a normal brotherly relationship.

{¶27} The foster mother in the twins' second foster placement testified that she and her husband provided a high level of care to Dominic in order to meet his medical needs described above. They provide Dominic with nutrition through his G-tube throughout the day, monitor his G-tube and the open wound providing the G-tube access to Dominic's stomach, ensure proper sterilization, and clean up Dominic's bowel movements roughly five

times per night. The twins' foster parents take Dominic for regular orthopedic appointments, and to the emergency room frequently (an estimated four or five times a month), including any time Dominic has a fever, which could threaten his life given his medical situation.

{¶28} The foster mother testified that it was likely "too much" for her and her husband to adopt the twins, but indicated that they would "have a really hard time letting them go" and that they were not in any hurry for the twins to leave their home. She stated that she and foster father loved the twins a great deal. The twins are bonded with their foster parents. Conversely, while the twins have had a series of brief supervised visits with Father, he had previously been absent from their lives for well over a year and there was no evidence of a real bond formed between Father and the twins. While the foster family did not express a firm intent to adopt the twins, and while it is possible the agency will ultimately place them with another family or families, the twins need caregivers who will provide a level of care and stability similar to that provided by the second foster family, and the record does not support that Father can provide that level of care or stability.

{¶29} The second best interest factor is "the wishes of the child, as expressed by the child or through the child's guardian ad litem, with due regard to the maturity of the child." R.C. 2151.414(D)(1)(b). Here, the twins were too young to express their wishes. However, the GAL opined that permanent custody should be awarded to the agency and that the twins should not be placed with Father. She was specifically concerned about the stability and permanency of Father's living arrangements in light of Dominic's specific medical needs, Father's lack of income and reliance on his girlfriend's ("Girlfriend") disability check, and her feeling that Father "has downplayed the seriousness" of Dominic's medical conditions. She additionally expressed concern about Father's lack of reliable transportation in light of the frequency of Dominic's urgent visits to the emergency room.

These issues are discussed in more detail below.

{¶30} The third best interest factor is "[t]he custodial history of the child." R.C. 2151.414(D)(1)(c). Father and Mother raised the twins together for the first 11 months of their lives, after which Father was incarcerated and Mother was the sole custodian. After Mother's death, the twins were initially placed with a foster family. They were then placed into another foster home when the first foster family was no longer able to care for them. As described above, the second foster mother testified that she and her husband were unsure whether they would adopt the twins but did not rule out the possibility.[5] Father has had no role in the twins' custodial history since he was incarcerated in May 2019.

{¶31} The fourth best interest factor is the twins' "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). In analyzing this factor, the juvenile court considered the status of Father's completion of the case plan, Father's housing, employment, and transportation situations, Father's history of not supporting his other children, and the likelihood that Father would not be able to meet Dominic's medical needs. We will also review these issues.

{¶32} The juvenile court noted that the case plan required Father to obtain a substance abuse assessment. Father testified that he last used drugs at the beginning of 2017, stating that at the time he used "opioids and pain medicines." The court concluded

---

5. After the magistrate's December 2021 decision but before the juvenile court's decision, CCDFJS filed an updated case plan which stated that "[Christopher] was moved to an adoptive home on 3/18/22. [Dominic] was moved to an adoptive home on 4/6/22 after being discharged from Children's Hospital." The juvenile court did not mention this information in its decision, but we assume the juvenile court was aware of it because the court stated that it had "fully reviewed the transcript from the proceedings in addition to the case file," and the updated case plan was part of the case file. Regardless, nothing in the updated case plan changes our analysis, and we see no reason to conclude that it would have changed the juvenile court's analysis even if it was unaware of the updated case plan and the twins' apparent change in custodial status. This is the case because the juvenile court's decision primarily focused on Father's shortcomings, not on whether the second foster family was an appropriate permanent placement for the twins. Furthermore, Father did not reference the updated case plan in his appellate brief and did not argue that it required a different analysis or result.

that Father failed to provide a specimen for a drug test as required and that the most recent results of a substance abuse assessment were not available. Based on our review of the testimony, it appears Father was not recommended for further substance abuse services.

**{¶33}** The juvenile court also noted that the case plan required Father to complete a mental health assessment. Father was previously diagnosed with bipolar disorder, ADHD, explosive personality disorder, and anxiety. However, he testified that he no longer experiences symptoms of these diagnoses, and believed the bipolar disorder was misdiagnosed. Father takes medication for back and neck issues, including medical marijuana, for which he has a license. Father reported that he completed a mental health assessment, but the results were not available at the time of the second trial and are not in the record.

**{¶34}** After his release from prison, Father temporarily lived with his mother. By the time of the second trial, Father had lived with Girlfriend and her daughter in their two-bedroom apartment for a few months. Father's name was not on Girlfriend's apartment lease as the landlord was aware of his extensive criminal history. Likewise, Father noted that he and Girlfriend were looking for alternative housing, but he had difficulty obtaining housing in his name due to his extensive criminal record. If Father was reunited with Dominic and Christopher, Girlfriend's daughter would sleep in one bedroom, the twins would sleep in the other bedroom, and Father and Girlfriend would sleep in the living room. Father testified that he did not have a housing contingency plan if his relatively recent relationship with Girlfriend ended. He stated, "Honestly, I don't know. I don't know what my contingency is because I haven't had time to really even fully ground an initial plan due to the amount of time I've had." We conclude that Father did not satisfy the case plan's requirement that he demonstrate "safe, stable, independent housing."

**{¶35}** Father's employment and financial situation was similarly problematic. Father testified that he was employed at Frisch's for approximately two and a half months following his release from prison, but he quit because his Frisch's work schedule interfered with his own medical issues and with his ability to complete his case plan. By the time of the second trial, he was unemployed. Father had "done a couple side jobs," including working as a handyman and as a mover, but this work generated little income. Father testified that he pays part of the bills, and Girlfriend confirmed that he has paid internet bills and part of the rent. Father appears to rely on Girlfriend financially; Girlfriend is a disabled veteran who receives a monthly check for $3,268.00, which she uses to pay most of the couple's household expenses. Father testified that he was seeking work and applying for jobs, but that his criminal record made it difficult to find a job. When questioned on how he would care for Dominic if he were awarded custody and if he obtained full time employment, Father did not provide a clear answer. In fact, Father stated that he did not think he could reunify with the twins if he were working full time, and suggested that Dominic's Social Security payments of roughly $800 per month could meet his income needs. Based on this testimony, Father did not satisfy the case plan's requirement that he obtain employment.

**{¶36}** Father's transportation situation was lacking as well. Father testified that he had not had a driver license in 20 years and that his license was suspended at the time of the second trial. In fact, Father's prison sentence arose in part out of Father driving under suspension. When questioned about how he would provide transportation for the twins if he received custody, Father stated that he can "pretty regularly" count on Girlfriend, his uncle, and his son to provide transportation. Notably, transportation is particularly important in this case, where Dominic's serious medical needs, sometimes life-threatening, require that he have reliable transportation to the emergency room multiple times per month.

Father's expectation that he could "pretty regularly"—but apparently not always—rely on others is troubling given Dominic's unique needs.

{¶37} Father is almost wholly reliant on Girlfriend for housing, income, and transportation. A grant of custody to Father under these conditions would represent a leap of faith that his relatively new relationship with Girlfriend of between three and six months will last.

{¶38} The trial court also had concerns regarding Father's ability to handle the twins' needs, especially Dominic's. Father had ten supervised visits with the twins, during which there were repeated issues. On one occasion, Father accidentally removed Dominic's G-tube and air entered the line. He testified that he did not attempt to reconnect the G-tube because "there was 20 or 30 minutes left of the visit" and "I would have spent the last 20 or 30 minutes of that visit dealing with the air in the line when I'm supposed to be playing with my kids and connecting with them." Father reasoned that based on what he thought was the amount of time Dominic was permitted to have the G-tube unattached, that it was safe to leave it unattached and continue his visitation. On another occasion, Father spent 45 minutes arguing with a worker at the facility rather than spending time with the twins. The GAL expressed concerns about Father's cavalier attitude towards certain aspects of Dominic's care, "downplay[ing] the seriousness" of Dominic's condition. The juvenile court appropriately shared these concerns.

{¶39} The trial court also noted that Father is more than $76,000 in arrears in child support for his other children. Despite not providing any financial resources to support Dominic and Christopher following his incarceration, Father nonetheless failed to pay child support to his other children during that time period. The record does not establish that Father would be able to support the twins financially if he were granted custody of the twins.

Father's apparent inability or unwillingness to meet his legal responsibilities to provide for his other children suggests he is not prepared to fulfill his responsibilities towards the twins in this respect. *See In re C.P.,* 12th Dist. Brown No. CA2022-05-004, 2022-Ohio-3320, ¶ 34 (questioning whether the father could provide permanency or security for the child when the father, who had ongoing financial difficulties, had not provided financial support for the child in the past and was also more than $5,000 in arrears in child support for his other child). Father's vague notion that Dominic's roughly $800 per month Social Security payments will provide sufficient income for him to support himself and the twins, when combined with the disability benefits received by his new Girlfriend, is not a realistic plan.

**{¶40}** Given Dominic's extremely demanding medical needs and Father's apparent "lack of attention to detail" in meeting those needs, the juvenile court determined it was "not willing to experiment with [Dominic's] health and welfare" by awarding custody of the twins to Father. Similarly, the magistrate "decline[d] to gamble [Dominic's] life on Father's bare assertion that he has appropriate transportation and income." Beyond Dominic's unique needs, the juvenile court concluded that "[b]oth of the twins need a home that is consistent, where they have room to play and develop to their maximum potential." The juvenile court found that despite Father's "compliance with some aspects of the case plan, the Court still has strong reservations regarding his ability to provide stability and security for his sons." We agree and find that while Father may genuinely hope to care for the twins and to provide them with a legally secure permanent placement, the record does not demonstrate that he has the ability to do so.

**{¶41}** The final best interest factor is whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the Father and the twins. R.C. 2151.414(D)(1)(e). Of these, R.C. 2151.414(E)(10) is relevant. R.C. 2151.414(E)(10) applies when the parent

"has abandoned the child." Both the magistrate and the juvenile court determined that Father had abandoned the twins. Father has not disputed this finding. As we have repeatedly noted, "R.C. 2151.011(C) plainly states that '[f]or purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, *regardless of whether the parents resume contact with the child after that period of ninety days.*'" (Emphasis sic.) *In re D.C.*, 12th Dist. Fayette No. CA2015-03-006, 2015-Ohio-3178, ¶ 38, quoting R.C. 2151.011(C). The juvenile court was presented with clear and convincing evidence that Father was incarcerated from August 2019 to December 2020, during which he had no contact with the twins. This far exceeded the statutory ninety day period, and therefore constituted abandonment. That he attempted to reinitiate contact after that time is irrelevant for a finding of statutory abandonment. *In re C.P.* at ¶ 36.

**{¶42}** Based on our review of the record, we conclude that the juvenile court did not err in determining that an award of permanent custody to CCDJFS was in the twins' best interest. There is more than sufficient credible evidence to support the juvenile court's determination that the statutory standards for permanent custody have been met. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Butler Nos. CA2018-03-035 and CA2018-0-04-038, 2018-Ohio-3341, ¶ 60. The record establishes that Father cannot provide these things.

**{¶43}** One final issue. Father argues in his brief that Dominic and Christopher are "very different." This appears to be an argument that the juvenile court improperly ignored the differences in their respective needs and medical situations when it found, relying in

part on Dominic's unique situation, that both Dominic and Christopher should be placed in the agency's permanent custody. We disagree. It is true that Dominic has serious medical needs that are not shared by Christopher. The juvenile court acknowledged the differences between the twins' needs and stated that it was "concerned not only about the special medical needs of [Dominic], but also about the *basic needs of both* children." (Emphasis sic.) As explained above, there was clear and convincing evidence supporting this conclusion.

### C. Second Prong of the Permanent Custody Test: "12 of 22" Analysis

{¶44} Father on appeal does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that the twins had been in the temporary custody of CCDJFS for at least 12 months of a consecutive 22-month period. Because Father does not challenge this "12 of 22" finding, we need not review the issue further. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because the twins were taken into CCDFJS's custody in August 2019 and remained in its custody through the completion of the second trial in September 2021.

### III. Conclusion

{¶45} In this case the trial court went out of its way to give Father a second chance by overruling the magistrate's decision after the first trial and allowing Father additional time to work a case plan. Father failed to satisfy most, if not all, of the case plan's requirements and the juvenile court concluded that it would be in the twins' best interest to be placed in the permanent custody of CCDJFS. We have carefully reviewed the evidence in this case. We find that the juvenile court's determination that an award of permanent custody to CCDJFS is in the best interests of the twins is supported by clear and convincing evidence

and is not against the manifest weight of the evidence.  The same is true with regard to the juvenile court's denial of Father's motion for custody.  Having found no merit to Father's arguments, we overrule Father's sole assignment of error.

**{¶46}**  Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.