[Cite as *In re W.R.*, 2023-Ohio-334.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


IN RE:                                          :
                                                        CASE NO. CA2022-09-091
    W.R., et al.                            :
                                                        O P I N I O N
                                                :          2/6/2023

                                                :

                                                :

                                                :


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2020-0284, JN2020-0285, JN2020-0286


Garrett Law Offices, and Dawn S. Garrett, for appellant.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting attorney, for appellant.

Nancy R. Braun, guardian ad litem.


**M. POWELL, J.**

{¶ 1} Appellant ("Mother") appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting the motion of the Butler County Department of Job and Family Services ("BCDJFS" or "the agency") for permanent custody of three of her

children, "Kathryn," "Wendell," and "Kristen" (collectively "the children").[1]

## I. Factual and Procedural Background

{¶ 2} Kathryn (born May 2016) and Wendell (born June 2017) are children of Mother and her ex-boyfriend ("Ex-Boyfriend"). Kristen (born April 2020) is a child of Mother and, allegedly, her current boyfriend ("Boyfriend"). (Ex-Boyfriend and Boyfriend will be referred to collectively as "the Fathers"). Mother has an additional child with Boyfriend, born October 2021, who is not subject to these proceedings. As of May 2022, Mother was pregnant with her fifth child, due November 2022, also with Boyfriend. Ex-Boyfriend has been incarcerated for the duration of these proceedings and is not due to be released until November 2029.

{¶ 3} On April 9, 2020, shortly after Kristen's birth, BCDJFS received a referral that both Mother and Kristen tested positive for amphetamines. Mother apparently told hospital staff that she had "tried" meth the day before the birth. The agency established an in-home safety plan with Boyfriend as the provider. One week later, however, both Mother and Boyfriend tested positive for controlled substances. The safety plan was modified, and the children's maternal grandmother was made the provider. Mother and Boyfriend were permitted supervised visitation.

{¶ 4} On October 5, 2020, BCDJFS received a report that Kathryn, then age four, had received a black eye from Mother. On investigating, the agency found that Mother and Boyfriend had been regularly spending unsupervised time with the children, and in fact, the children had been living with them for at least two months prior to this incident. The same day, the agency filed for temporary custody of all three children, alleging dependency pursuant to R.C. 2151.04(C). Temporary custody was granted, and the children were

---

1. "Kathryn," "Wendell," and "Kristen" are pseudonyms, adopted in this opinion for purposes of privacy and readability. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1.

placed in a foster home. Following an adjudicatory hearing which none of the children's parents attended, the juvenile court entered a finding of dependency for all three children.

{¶ 5} Mother and Boyfriend were given a case plan with the aim of reunification. They were required to complete a Substance Abuse and Mental Illness ("SAMI") assessment, mental health assessment, and domestic violence assessment, to follow all recommendations from those assessments, obtain and maintain housing, and find sources of income. Both were given opportunities for supervised visitation.

{¶ 6} Review hearings were held on March 22, June 7, August 16, November 15 and December 27, 2021. Mother attended most of the hearings, but the Fathers did not. Numerous social summaries prepared by the agency and filed with the court showed that Mother was making little progress with the case plan. On January 12, 2022 the agency filed motions for permanent custody of the children. A trial was held before the magistrate on May 18, 2022.

{¶ 7} Kelly Hurley, the Butler County Children Services ("BCCS") caseworker for the children testified that following Mother's first SAMI assessment in May 2020, Mother had "very sporadic attendance in treatment." She completed a second SAMI assessment in April 2021 which reiterated the recommendation that Mother engage in treatment services. Mother began treatment in July 2021, initially attended treatment sessions regularly, and then abruptly ceased attendance in October 2021. In the "couple of months" leading up to trial, Mother again engaged in "sporadic attendance" at treatment, despite being recommended in February 2022 for residential treatment. Despite Hurley's repeated attempts, Mother delayed signing the releases necessary to enter treatment for two months. On April 26, 2022, three weeks before the permanent custody trial, Mother entered a residential treatment program. However, she also reported using drugs that same day.

{¶ 8} Following trial, the magistrate continued the matter for an additional hearing

on June 9, 2022, to perfect service on Ex-Boyfriend. Ex-Boyfriend was served and failed to appear.

{¶ 9} On June 21, 2022 the magistrate issued a decision granting permanent custody to the agency, and the juvenile court adopted the magistrate's ruling the same day. Mother timely objected to the magistrate's decision, arguing that she was "in substantial compliance with the case plan" and that it was "not accurate that the [children] cannot or should not be placed with her within a reasonable amount of time."

{¶ 10} On September 6, 2022, the juvenile court held a hearing on Mother's objections. The same day, the juvenile court issued a sparse, less than one page written order overruling Mother's objections in each of the children's individual cases.[2] Mother timely appealed, raising two assignments of error.

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE JUVENILE COURT ERRED BY GRANTING THE MOTION FOR PERMANENT CUSTODY WHERE THE RECORD DOES NOT SUPPORT A FINDING THAT SERVICE HAD BEEN PROPERLY COMPLETED ON THE FATHER AND "JOHN DOE" FATHER AT THE TIME OF TRIAL.

{¶ 13} In her first assignment of error, Mother argues the juvenile court erred by failing to serve Ex-Boyfriend, the father of Kathryn and Wendell, and "John Doe," the unknown father of Kristen with a copy of the agency's motion for permanent custody.[3] This argument is unpersuasive for several reasons.

---

2. Given the brevity of the juvenile court's order, most of the quotation below comes from the magistrate's thoughtful, detailed opinions. "Though the record in the present case was sufficient to allow this court's review without a more robust explanation from the juvenile court, we note that the best practice is for the juvenile court to set forth a detailed discussion of the factors it considered * * *." *In re W.D.K.*, 12th Dist. Butler No. CA2021-12-156, 2022-Ohio-2724, ¶ 19.

3. Boyfriend is the alleged father of Kristen, but in light of his failure to complete genetic paternity testing ordered by the magistrate, an abundance of caution necessitated the service of "John Doe."

{¶ 14} First, Mother waived this argument by failing to timely raise it below. Juv.R. 22(D) provides that defenses or objections based on defects in the complaint or in the institution of the proceedings must be raised prior to the adjudicatory hearing. Juv.R. 22(D)(1) and (2). Further, this court has long held that we are not obligated to consider any error which could have been called to the trial court's attention at a time when the error could have been avoided or corrected by the trial court. *In re Songer*, 12th Dist. Butler No. CA92-08-156, 1993 WL 220254, *1 (June 21, 1993). Mother did not raise the issue of service to Ex-Boyfriend or John Doe until this appeal and consequently, waived the argument.

{¶ 15} Second, Mother failed to raise this argument in her objections to the magistrate's decision. Juv.R. 40(D)(3)(b)(iv) provides that "a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion" pursuant to the procedure set forth in the juvenile rule. The rule embodies the principle that the failure to draw the trial court's attention to potential error, where the trial court could have corrected the error, results in a waiver of that argument on appeal. *In re J.W.*, 12th Dist. Butler Nos. CA2017-12-183 and CA2017-12-184, 2018-Ohio-1781, ¶ 12. While Juv.R. 40(D)(3)(b)(iv) excepts "plain error" from this waiver rule, this court has previously ruled that unless the appellant argues a "claim of plain error," the appellant has waived the claimed errors not objected to below. *In re K.P.R.*, 197 Ohio App.3d 193, 2011-Ohio-6114, ¶ 10 (12th Dist.). Mother does not argue plain error.

{¶ 16} Third, assuming, arguendo, that Mother could raise the argument, the record shows that proper service by publication was made on John Doe. Juv.R. 16(A) provides that "[s]ervice by publication shall be made by newspaper publication, by posting and mail, or by a combination of these methods," and that the court, "by local rule, shall determine which method or methods of publication shall be used." The Local Rules of the Butler

- 5 -

County Juvenile Court provide that "[u]pon proper application and affidavit which must be filed with the clerk at least twenty-one (21) days before the date of the hearing for which notice is to be provided, service by publication may be perfected, pursuant to Ohio Juv. R. 16, by posting." Butler Cty.Loc.Juv.R. 79. Such notices "shall remain posted for no fewer than seven (7) full days" and be posted "in no fewer than four conspicuous public locations in Butler County." *Id.* An affidavit for service by publication on the unknown father was filed on March 1, 2022. Service was published between April 28 and May 5, 2022 in four government buildings in Hamilton, Ohio.

{¶ 17} Proper service on Ex-Boyfriend also appears to have been perfected. The record demonstrates that BCCS attempted to serve Ex-Boyfriend multiple times at Pickaway Correctional Institution in Orient, Ohio. Each time, however, the certified mail receipt was returned without a signature. To remedy this, following the trial on May 18, 2022, a "call in the hall" was scheduled for June 9, 2022 to perfect service. Once again, Ex-Boyfriend did not appear. In a subsequent order the same day, the magistrate stated that Ex-Boyfriend "was served with notice of today's proceeding and failed to appear." Mother did not object to this determination.

{¶ 18} Fourth, assuming Mother had not waived the argument, and that service had not been properly completed, Mother lacks standing to challenge service of Ex-Boyfriend or John Doe. We note that our sister districts have determined that "an appellant-mother may challenge an alleged service error regarding a non-appealing party only when she has demonstrated that she herself has been prejudiced by the alleged error." *In re A.M.*, 9th Dist. Summit No. 26141, 2012-Ohio-1024, ¶ 13; *see also In re D.D.*, 1st Dist. Hamilton No. C-190387, 2019-Ohio-4492, ¶ 18; *In re M.M.*, 8th Dist. Cuyahoga No. 79947, 2002 WL 207610, *5 (Feb. 7, 2002). Mother has not demonstrated that she sustained any prejudice from the alleged failure to serve either Ex-Boyfriend or John Doe, other than conjecture that

it may have extended the case to give her more time. However, despite agency involvement and assistance for nearly two years prior to the filing of the motion for permanent custody, Mother had yet to remedy the conditions which necessitated removal of the children from her custody. There is nothing in the history of this case to suggest that mother would have availed herself of any additional time to do so.

{¶ 19} Mother's first assignment of error is overruled.

{¶ 20} Assignment of Error No. 2:

{¶ 21} THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 22} Mother argues that the juvenile court's decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence. We address that argument below after summarizing the applicable legal standard.

## II. Applicable Law

{¶ 23} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.P.*, 12th Dist. Preble No. CA2021-11-017, 2022-Ohio-1155, ¶ 11. Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 17. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, using, in part, the factors of R.C. 2151.414(D). *In re M.H.*, 12th Dist. Clermont Nos. CA2021-08-047, CA2021-08-048, and CA2021-08-049, 2022-Ohio-48, ¶ 35. Second, the juvenile court must find that one of the circumstances set forth in R.C.

2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 12th Dist. Butler Nos. CA2022-01-003 and CA2022-01-004, 2022-Ohio-1705, ¶ 31. Those circumstances include, but are not limited to: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period; and (4) when the previous circumstances do not apply, the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents. R.C. 2151.414(B)(1)(a), (b), (c), and (d). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 16.

{¶ 24} An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re R.F.*, 12th Dist. Warren Nos. CA2021-06-052, CA2021-06-053, and CA2021-06-056, 2021-Ohio-4118, ¶ 7. This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented. *In re M.N.*, 12th Dist. Fayette No. CA2021-07-015, 2021-Ohio-4042, ¶ 19.

{¶ 25} Even if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence. *In re F.S.*, 12th Dist. Fayette Nos. CA2020-08-011 and CA2020-08-012, 2021-Ohio-345, ¶ 61. To determine whether the judgment was against the manifest weight of the evidence, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *In re K.M.*, 12th Dist. Butler Nos. CA2020-03-031, CA2020-03-

032, and CA2020-03-033, 2020-Ohio-3602, ¶ 25. The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re R.K.,* 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074. Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is most favorable and consistent with the verdict and judgment. *In re D.S.,* 12th Dist. Clinton Nos. CA2021-10-030 and CA2021-10-031, 2022-Ohio-998, ¶ 63.

### III. First Prong of the Permanent Custody Test: Best Interest Analysis

{¶ 26} Mother asserts that she "was in services and making progress" at the time of trial. She argues that it was in the best interest of the children to deny the agency permanent custody because, although she "was late to begin services consistently, * * * she is working them steadily now."

{¶ 27} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, the court must consider all relevant factors, including, but not limited to the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

*In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 23. The juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re C.P.*, 12th Dist. Brown No. CA2022-05-004, 2022-Ohio-3320, ¶ 29.

{¶ 28} As stated above, the first best interest factor is "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). The juvenile court considered the children's relationships with Mother, the Fathers, each other, and the foster parents. We do the same.

{¶ 29} At trial, the BCCS caseworker described Mother's attendance at weekly supervised visitation with the children as "very sporadic." However, Mother was in fairly consistent telephone contact with the children, and the caseworker described her as having a "good relationship" with them and "lov[ing]" them. Nonetheless, the caseworker expressed the view that telephone communication with these young, easily distractable children was no substitute for regular in-person contact, which Mother failed to provide.

{¶ 30} The magistrate acknowledged that "Mother has demonstrated an ability to interact appropriately with the child[ren] during visitation," but added that "she has been inconsistent in her attendance of visitations" despite living a mile and a half from the center where visitation occurred and despite being offered free transportation. The magistrate further noted that although Mother "maintained telephone contact with the children with the assistance of the foster parent, she would go months without any face to face contact." To the extent visitation occurred, Kathryn and Wendell would both act out behaviorally as a result.

{¶ 31} Ex-Boyfriend, the father of Kathryn and Wendell, has been incarcerated on

charges of child endangerment related to conduct involving Kathryn in 2016, and attempted rape involving another minor. He is not scheduled for release until November 2029, and has not participated in this matter in any way. He has no connection or bond with the children.

{¶ 32} Boyfriend, the alleged biological father of Kristen, participated in in-person visitation sporadically from January 2021 to June 2021, but not since then. Boyfriend did not complete any aspect of the case plan for reunification, and to the extent he cooperated with testing, consistently tested positive for drugs. He was ordered to submit to genetic testing on August 16, 2021, but also failed to do so. The magistrate found that "[d]ue to lack of contact, there is no evidence that he has a bonded relationship with this young child."

{¶ 33} By contrast, the magistrate found that all three children were "doing well" in their foster placement and had bonded well with the foster mother and extended foster family. The caseworker testified that the children are "very bonded to the foster family" and are "having all their needs met." Mother also agreed that the children are bonded with their foster mother. The children have been in the same foster home since their removal. Another of their siblings of whom the agency has temporary custody but who is not subject to these proceedings shares the same foster home. The magistrate found that the foster parents "have expressed interest in adoption of the children as a sibling group if they were available for adoption."

{¶ 34} The second best interest factor is "the wishes of the child, as expressed by the child or through the child's guardian ad litem, with due regard to the maturity of the child." R.C. 2151.414(D)(1)(b). Here, the children were too young to express their wishes. However, the guardian ad litem recommended that permanent custody be awarded to the agency.

{¶ 35} The third best interest factor is "[t]he custodial history of the child." R.C.

2151.414(D)(1)(c). Mother and Boyfriend raised the children following Ex-Boyfriend's arrest and conviction for attempted rape and child endangerment. Mother knowingly violated the safety plan by living with Boyfriend and the children for at least two months before being discovered on October 5, 2020. Since that time, the children have resided together in the same foster home with foster parents who have expressed interest in adopting them as a sibling group. The magistrate found that the children had been "in the agency's custody for a total of 14 months prior to the filing of the motion for permanent custody," and "for approximately 18 months since the case was filed by the time of [trial]."

{¶ 36} The fourth best interest factor is the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). The caseworker testified that Kathryn and Wendell both have academic delays and have both completed speech and occupational therapy. Additionally, Wendell has "sensory issues" and is louder and more boisterous than would be expected for a child his age. As a result, he was scheduled for a psychological evaluation at the time of trial. Kristen also possibly has sensory issues. Kathryn and Kristen both tested positive for controlled substances at birth.

{¶ 37} The magistrate found that "Kathryn has special needs and is on an [individualized education plan ("IEP")] at school"; "has speech delays and global developmental delays"; "receives speech therapy, occupational therapy services and counseling services through her school"; and "struggles with basic academic skills and is behind her same-aged peers." The magistrate found that Wendell also "has special needs and is on an IEP at his preschool"; "has speech delays" and "receives speech therapy through his school"; "is significantly behind his same-aged peers"; and "has some acting out behaviors and difficulties with self-regulation."

{¶ 38} The final best interest factor is whether any of the factors in R.C.

2151.414(E)(7) to (11) apply in relation to Mother and the children. R.C. 2151.414(D)(1)(e). None of these factors applied to Mother.

{¶ 39} Based on our review of the record, we conclude that the juvenile court did not err in determining that an award of permanent custody to BCDJFS was in the children's best interest. There is more than sufficient credible evidence to support the juvenile court's determination that the statutory standards for permanent custody have been met. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Butler Nos. CA2018-03-035 and CA2018-0-04-038, 2018-Ohio-3341, ¶ 60. The record establishes that Mother cannot provide these things.

{¶ 40} Lastly, we note that the crux of Mother's argument is that because she was in compliance with the case plan at the time of trial, she deserved more time to complete it. It is well established, however, that a parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification, as the case plan is simply a means to a goal, but not the goal itself. *In re A.R.*, 12th Dist. Butler No. CA2015-08-143, 2016-Ohio-4919, ¶ 18. That is to say, the "successful completion of case plan requirements does not automatically preclude a grant of legal custody to a nonparent." *Id.* Further, "Mother's claim that she would be on track for reunification with [the children] within just three short months requires this court to not only speculate on Mother's sincerity but to gamble with [the children's] li[ves]." *In re G.W.*, 12th Dist. Butler No. CA2019-01-003, 2019-Ohio-1586, ¶ 52. "A child's life is not an experiment that can be left to chance." *Id.*

{¶ 41} Here, the caseworker testified that at the time of trial, there was nothing else Mother should have been doing to be in compliance with the case plan. The magistrate found that "[d]espite her participation in some services, the agency presented clear and

convincing evidence that the concerns which caused the children to be removed have not [been] remedied and that significant concerns remain." We agree. While Mother was in complete compliance with the case plan for the three weeks preceding trial, this is three weeks in an 18-month period since the children were initially removed, and a two-year period since the agency first became involved. Mother's seriousness about following the case plan is ultimately too little, too late.

### IV. Second Prong of the Permanent Custody Test: "12 of 22" Analysis

{¶ 42} Mother on appeal does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that the children had been in the temporary custody of BCDJFS for at least 12 months of a consecutive 22-month period. Because Mother does not challenge this "12 of 22" finding, we need not review the issue further. *In re J.N.L.H.*, 12th Dist. Butler No. CA2022-06-063, 2022-Ohio-3865, ¶ 26. However, we note that the record unquestionably establishes that the "12 of 22" finding was met in this case because the children were taken into BCDJFS's custody in October 2020 and remained in its custody through the completion of the trial in May 2022 and beyond.

### V. Conclusion

{¶ 43} Throughout the course of these proceedings, from the first involvement of BCDJFS to the trial, Mother showed herself consistently unable or unwilling to commit to sobriety, frequently either testing positive for drugs or failing to test. Mother's attendance at mental health treatment was described in similar terms. These children deserve better, and while Mother was "in substantial compliance with her case plan" for the three weeks preceding trial, it was too little, too late. From October 2020 to April 2022, while her children remained in foster care, Mother took no serious steps to reunify with them. Her actions for the 14 months following their removal speak louder than those in the one month preceding trial. Accordingly, we find that the juvenile court's decision granting BCDJFS's motion for

permanent custody was supported by sufficient evidence and was not against the manifest weight of the evidence. Mother's second assignment of error lacks merit and is overruled.

{¶ 44} Judgment affirmed.

HENDRICKSON, P.J., and BYRNE, J., concur.